Margaret PHILLIPS, Appellant,

v.

Eugene WIRTHMAN, Respondent.

No. KCD 26254.

Missouri Court of Appeals,
Kansas City District.

Nov. 4, 1974.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 2, 1974.

Application to Transfer Denied
Jan. 13, 1975.

David Q. Reed, Robert P. Gingrich, Jr. Kansas City, for appellant.

Russell D. Jacobson, Kansas City (Morris, Foust, Moudy & Beckett, Kansas City, of counsel), for respondent.

Before PRITCHARD, P. J., and SWOFFORD, SOMERVILLE and TURNAGE, JJ.

PRITCHARD, Presiding Judge.

Plaintiff, Margaret Phillips, received a verdict for $12,000.00 for personal injuries sustained when, in May of 1965, defendant's dog, tethered by a heavy chain in a garage on defendant's farm, rushed out of it, wrapped the chain around Margaret's left leg, throwing her to the driveway and breaking her leg. The trial court sustained defendant's after-trial motion for judgment in accordance with his motion for directed verdict made at the close of the whole case. The ruling on the motion does not specify the ground upon which it was made, but one ground specified in the motion is this: "Plaintiff's own evidence shows that she was guilty of contributory negligence as a matter of law and voluntarily assumed the risk in taking a route which she knew would require her to pass in close proximity to the dog at the time and place in question with full knowledge of the dog's tendencies to be boisterous and to jump on people."

Margaret was a practical nurse. She came to stay at defendant's farm home near Raymore, Missouri, because her duplex home was being sold and she, having a cat, "Casey", could find no other place to live. Margaret pleaded, and the evidence tends to show, that she was an employee of defendant. Defendant had a large police dog named "King". Margaret had been at defendant's home less than a month, when in May, 1965, she was thrown to the driveway and entangled in King's chain leash. Prior to that time, according to Margaret, King had pinned a young boy against the kitchen wall, and had bitten a man from Jefferson City on the leg which required 18 stitches; he "was wild as a March Hare". Defendant did not know how to control him—he whipped him but that got nowhere. As to the description of King, Margaret testified: "[H]e wasn't—he didn't mean to be vicious. The only thing was he was very highly protective and especially toward me. He did not go out to the chicken house to feed the chickens because he killed off every damn chicken Mr. Wirthman had, besides trying to kill the calf—because he was afraid they were going to get us, you see."

About 5:30 in the evening Margaret was cooking supper, and defendant had to wait until he gave two calves some medicine. The next thing, defendant called to her and said, " 'Bring me down that rope.' " He used a rope to tie up the calves. Margaret started out with the rope, not then knowing that King was tied in the garage. Had she known he was there she would have gone another route through the screened porch by which she would have avoided him. She was afraid King, who weighed as much as she, was going to knock her down. As she reached the driveway King came out, and she said, " 'King, get back in the garage.' " He minded, and went back in, but no more than he got back "than here he came again." "The third time I thought well there is only one way to do and that is to sprint for it." King came out as she sprinted for it, and she saw the heavy chain, which wrapped three times around her left leg, like a whip.

On cross-examination, Margaret testified that King was pretty bad about rearing up on her or putting his paws on her. "Oh yes, he'd be glad to see me. He'd jump up on me and about knock me flat." On one occasion King had put his paws on her shoulders when she was wearing a hat with a bird on it which worried him. "Q Was there any particular reason, the day the accident occurred, you were so concerned about getting close to the dog when you had him around you all the time? A I was in a hurry. Gene was yelling and the calves were bawling, and he was yelling bloody murder for me to hurry and I was in a hurry and I couldn't get by him. * * * Q You fussed at him to go back and he went back once and then you said he went back the second time and the third time he came out you got tangled up in the chain? A I didn't get tangled up. He wrapped it around my leg. * * * Q And the third time out was when the chain arked as he came running out toward you, is that right? A Yes. Q Kind of made a loop in the air as he ran out? A That's right. I was trying—Q And you knew there was a possibility of that dog coming running out again, I take it? A I didn't think anything of it, I told you, one way or another. I thought I could get across the drive before he could get to me. Q You knew he'd come out? A No, I didn't. Q You had figured it was possible? A I didn't figure anything about it. I was trying to get to the drive to get that rope down to shut him up." The third time Margaret started to go across she knew where the dog was, and she could still have gone inside and gone out the screened porch. She thought she could still make it across that drive. "Q Now, you knew just as much about the dangers or the hazards involved in going across that driveway as Mr. Wirthman did, probably more, didn't you? A Well, I guess I did. I said I didn't think anything about it. I

was intent on getting that rope down there."

 Assuming that defendant was negligent in chaining King, knowing him to be boisterous, to the center post of the garage, with the leash of sufficient length (about 10 feet) that he could rush out upon someone crossing the driveway, yet the above testimony shows Margaret to have been contributorily negligent as a matter of law. She exposed herself voluntarily to a danger known to her and appreciated by her. She knew as much about the danger or hazard of crossing the driveway as defendant. Dietz v. Magill, 104 S. W.2d 707, 711 [3, 4] (Mo.App.1937); Stein v. Battenfeld Oil & Grease Co., 327 Mo. 804, 39 S.W.2d 345, 351 [12–14] (1931). Although there is authority for the rule that "one may not be guilty of negligence in exposing himself or his property to known and appreciated danger where there is some reason of necessity or propriety to justify him in so doing," 65A C.J.S. Negligence § 121, p. 72; Fletcher v. Kemp, 327 S.W.2d 178, 183 (Mo.1959), yet under the evidence here of defendant "yelling bloody murder" for Margaret to hurry and bring the rope, there is no justification for her to undertake to sprint across the driveway when she knew she would be within range of the boisterous King whom she was afraid would knock her down. This is especially true where Margaret knew that there was another available route through the screened porch, which would avoid King, and thus be safe. See Chisenall v. Thompson, 363 Mo. 538, 252 S.W.2d 335, 338 (1952), holding that where the plaintiff had not been ordered by his employer to follow the dangerous method of cleaning a corn picker, but chose it himself, he was guilty of contributory negligence. The judgment for him was reversed. There is yet another rule which bars recovery set forth in Restatement, Second, Torts, § 478, p. 529: "When the negligent act of the plaintiff is necessary to make a dangerous situation negligently created by the defendant effective in harm, the plaintiff's negligence is always a contributory factor in producing his harm and as such prevents him from recovery against the negligent defendant." See Hamilton v. Laclede Electric Cooperative, 294 S.W.2d 11, 17 (Mo.1956); and Burroughs v. Union Electric Company, 366 S. W.2d 69, 74 (Mo.App.1963); adopting the restatement rule in this state.

It is unnecessary to consider the matter of the validity of a release given by Margaret to defendant and his insurer offered to support the post-trial ruling of the court, or to consider the propriety of the giving of certain instructions claimed to be erroneous and supportive of the alternative granting of a new trial.

The judgment is affirmed.

All concur.